COURT OF APPEALS
DECISION
DATED AND FILED

April 8, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP2645-FT**

Cir. Ct. No. 2021GN19

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

IN THE MATTER OF THE GUARDIANSHIP AND PLACEMENT OF L.J.F.G.:

WINNEBAGO COUNTY,

PETITIONER-RESPONDENT,

V.

L.J.F.G.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Winnebago County: DANIEL J. BISSETT, Judge. *Affirmed*.

¶1    GROGAN, J.[1]  L.J.F.G., hereinafter referred to as "Emily,"[2] appeals from a WIS. STAT. ch. 55 ("ch. 55") order authorizing the involuntary administration of psychotropic medication (Involuntary Medication Order).  Emily contends that Winnebago County failed to introduce clear and convincing evidence that supports the circuit court's conclusion that she is dangerous pursuant to WIS. STAT. § 55.14(3)(e) and WIS. STAT. § 51.20(1)(a)2.a-e, and that the court therefore erred in entering the Involuntary Medication Order.  This court affirms.

## I.  BACKGROUND

¶2    Emily has a lengthy history of mental illness and has been diagnosed with bipolar disorder and schizophrenia/schizoaffective disorder.  In January 2021, the County petitioned for permanent guardianship due to incompetency and for protective placement, and the circuit court entered orders granting both petitions in March 2021.  Just over one year later, in May 2022, the court granted the County's subsequent request for an involuntary medication order, which it stayed pending appeal, and we affirmed that order in an April 2023 opinion.  *See **Winnebago County DHS v. L.J.F.G.***, No. 2022AP1589, unpublished slip op. (WI App Apr. 12, 2023).  In September 2023, our supreme court denied Emily's petition for review in that matter and the circuit court thereafter lifted its stay of the May 2022 involuntary medication order.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24). This is an expedited appeal under WIS. STAT. RULE 809.17.  All references to the Wisconsin Statutes are to the 2023-24 version.

[2] This court uses a pseudonym to protect L.J.F.G.'s privacy.  *See* WIS. STAT. RULE 809.86(4).  Like the parties, as well as the appellate court in her prior appeal, ***Winnebago County DHS v. L.J.F.G.***, No. 2022AP1589, unpublished slip op. (WI App Apr. 12, 2023), this court refers to L.J.F.G. as Emily.

¶3 In February 2025, the County filed a petition for an involuntary medication order as part of Emily's annual *Watts*[3] due process review. In conjunction with that petition, the circuit court appointed Dr. Jagadeeswana Musunuru to conduct an independent evaluation and a related psychotropic medication evaluation. The court held a hearing on the petition in May 2025. Dr. Musunuru testified at the hearing, and the court admitted two of his reports— the "Examining Physician's or Psychologist's Report (Adult Guardianship)" (hereinafter the Guardianship Report) and the psychotropic medication report (hereinafter the Involuntary Medication Report)—into evidence.[4]

¶4 At the hearing, Dr. Musunuru testified he is a licensed physician in Wisconsin, that he has "been practicing psychiatry since 1980[,]" that he has been "the head program director and clinical director for Fond du Lac County Human Services for 42 years[,]" and that he "do[es] a lot of court evaluations." Dr. Musunuru explained he had evaluated Emily via Zoom and that as part of his evaluation, he reviewed prior court evaluations and treatment records. He also confirmed he had briefly spoken with Emily's social worker in Trempealeau County. According to Dr. Musunuru, it was his opinion, to a reasonable degree of medical certainty, that Emily is incapacitated and that her incapacitation is "likely to be permanent." He then went on to explain that Emily has had a "chronic mental illness" for approximately "34 years or even longer[,]" that because of her mental illness and "noncomplian[ce] with the treatment[,]" "she developed a lot of

---

[3] *See* ***State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.***, 122 Wis. 2d 65, 362 N.W.2d 104 (1985).

[4] A third report—entitled "Report of Examination § 51.20, WIS. STATS."—was filed alongside the two reports admitted into evidence at the May 2025 hearing. That report, which is in the Record, was briefly referenced at the hearing but was not moved into evidence.

cognitive problems" and was "getting a lot more forgetful, not able to care for herself[,]" and that Emily does not take her medication as necessary.

¶5 In regard to Emily's "chronic mental illness," Dr. Musunuru testified that at present, Emily's diagnosis "is more of a schizophrenia/schizoaffective disorder" that had "started as a bipolar disorder and gradually turned worse" and that she was now "showing more symptoms of schizoaffective disorder." When asked whether Emily currently "require[s] placement in a licensed, certified, or registered setting[,]" Dr. Musunuru responded affirmatively. Further elaborating, he went on to explain that Emily "gets … mood changes from time to time and … can be aggressive[ and] violent" and that she "need[s] to be watched very careful[ly] because she gets--frequently talks about hurting herself or hurting others." He also testified that as "part of her illness," and in addition to her mood changes, Emily is "irritab[le], angry, and unable to care for herself" and that this requires "24-hour supervision." The County also asked Dr. Musunuru about the "types of harm or dangers" he would be "concerned about" if Emily "were not placed in a licensed, certified, or residential setting," and he testified that Emily is "not able to care for day-to-day needs[,]" that "she gets delusional thinking, thoughts of hurting people, killing people[,]" and that Emily had been "talking about killing a lot of people when [he] was evaluating her."

¶6 Specifically in regard to the requested involuntary medication order, Dr. Musunuru confirmed he had evaluated Emily and that the information provided in that report was also accurate to a reasonable degree of medical certainty. He went on to describe Emily's prescribed medications, explaining the medications had been prescribed to treat her mental illness because she "needs psychotropic medication to control her mood and other symptoms." Dr. Musunuru described the advantages of medication as including greater

4

stability of Emily's symptoms, improving her ability to function, and improving her ability to "communicate and also not get into any trouble." As to the medications' disadvantages, Dr. Musunuru testified the medications can lead to "dryness of the mouth, constipation, blurring, dizziness, and drowsiness." According to Dr. Musunuru, there are no alternatives to these medications because "there's nothing that's going to help her and she doesn't think she's in need of the medications[,]" and he confirmed that although he had described these advantages, disadvantages, and alternatives to Emily, she was not capable of understanding them. Dr. Musunuru explained Emily was not capable of doing so "[b]ecause of her mental illness and her poor judgment chronic mental illness."

¶7 Emily's counsel briefly questioned Dr. Musunuru on cross-examination. Dr. Musunuru reiterated that the least restrictive placement for Emily would depend upon whether she continued to take her medications as prescribed, noting that if she continued to take her medications "there is a possibility she can be moved to a less restrictive place like a halfway house." He also confirmed he was requesting that Emily be ordered to continue the medication and that the reference to the WIS. STAT. § 51.20 dangerousness standards in his report—the "Report of Examination § 51.20, WIS. STATS." that neither party moved into evidence at the hearing—specifically "denoted the a and b standards."

¶8 Dr. Musunuru's reports support his testimony. The Guardianship Report, for example, describes Emily's lengthy history of mental illness, noting it goes back to at least 1995 and that "[s]he refuses to take medications orally." The report also makes multiple references to Emily having threatened to kill people: (1) "She is talking about killing [a] few people[,]" including "her husband, and her psychiatrist"; (2) at the time of the evaluation, Emily was "making verbal threats of killing" her husband, whom she "insists at this time she is separated from";

(3) "She has been talking about killing and suing [a] lot of the people"; and (4) "She [has] verbalized attacking, suing and wish of killing." Similarly, the Involuntary Medication Report states that Emily's "behavior[] is unpredictable and dangerous" and that her "[p]ersistent delusions induced behavior can lead to unanticipated dangerousness to her or others."[5]

¶9    Randall Herman, a professional counselor and social worker who has worked with Emily at the Trempealeau County Health Care Center, also testified at the hearing. Mr. Herman testified that Emily resided "on a medium security unit" at the time of the hearing and that "she has almost full privileges at this time[,]" and he further explained that Emily is "fairly independent with her personal cares" and that she "sees a psychiatrist … to manage her medications for her diagnosed mental illness." When asked whether he had "observe[d] any behaviors within the last year that would be considered dangerous, harmful to [Emily] or harmful to others[,]" Mr. Herman stated he had "not personally witnessed any acts, physical aggression toward other people, nor … any self-injury." He explained, however, that Emily can be "verbally abusive to peers and to staff" and confirmed he had "been on the receiving end of that a few times" as well. Mr. Herman further testified that Emily's "interactions could be considered threatening towards the staff[,]" though he suggested that may "not simply [be] because she's targeting them but is frustrated with her situation and having to be in a facility." He later elaborated that he was "not sure … the verbal abuse" was directed at him or any other specific party but rather may have been due to "her illness and personality[.]"

---

[5] Dr. Musunuru's third report—the WIS. STAT. § 51.20 report—not admitted into evidence contains similar information.

¶10    The County thereafter sought to introduce the annual protective placement review and requested that the circuit court take judicial notice of it. Emily objected and asked the court to take testimony prior to admitting the annual review into evidence, and the court agreed to do so. Ultimately, however, the court did not allow the witness—who had drafted the annual review—to testify due to a sequestration issue wherein the witness had been present in the courtroom during prior witnesses' testimony. The court also indicated that although it could review the report absent supporting testimony because it was in the Record, it "would put very little, if any, credibility to that report" due to the lack of testimony and authentication.

¶11    Following the witnesses' testimony, the parties made final arguments to the circuit court. The County argued that continuation of Emily's protective placement was appropriate based on both Dr. Musunuru's and Mr. Herman's testimony regarding Emily's mental illness and her needs for addressing her mental illness. It likewise argued the involuntary medication order was appropriate based on Dr. Musunuru's testimony that medication was necessary to treat her condition and that Emily had made threatening comments, including references to killing people, and that she could be "impulsive" and/or "angry." The GAL largely asserted the same arguments and pointed specifically to the testimony that Emily had threatened to harm others and that "there are threats about harming other people" and "threats of killing people."

¶12    Emily, to the contrary, asserted the County had failed to meet its burden as to the involuntary medication request. Specifically, she argued the testimony failed to offer "any specific instances that would support a [WIS. STAT. §] 51.20 finding" that would satisfy the WIS. STAT. § 55.14(3)(e) requirements for involuntary medication because Dr. Musunuru had offered only "very vague and

kind of loose testimony about there being threats, there being violence" and that "it was really unclear if he had actually witnessed any of these things or if they were anything that he wasn't just hearing or reviewing in other records." Mr. Herman's testimony, she argued, was similarly "very loose," and she said his statements regarding verbal abuse were "general" and that he "went as far to say that there's nothing physical going on and that when the verbal abuse is happening, it's not because she's targeting people, it's not because she has issues with people, but she's frustrated with her placement[.]" Emily also asserted the County failed to establish the protective placement was appropriate given that the testimony indicated she could take care of her daily needs.

¶13 The circuit court ultimately granted the County's protective placement and involuntary medication petitions. In doing so, it relied largely on Dr. Musunuru's testimony, pointing out he had testified as to Emily's incapacities stemming from a permanent "chronic and persistent mental illness[,]" that she required "some form of 24-hour supervision," and that medication provided the best treatment option. The court also specifically recounted Dr. Musunuru's testimony regarding Emily's threats to others, stating:

> He did testify that she does or has made threats of harm to others. He does reference in his report a number of times about her talking about killing other people. And I believe, although I don't have the specific quote in my notes, but I do have it in my notes that she did indicate *some threats of killing others to the doctor during the evaluation* and that they are also contained in the reports. So I do think that there is that type of dangerousness with regards to those threats of harm.

(Emphasis added.) Later in its ruling, when addressing Emily's need for medication more specifically, the court further noted that despite some disadvantages and side effects, "[p]sychotropic medication has advantages and …

8

it helps with regards to [Emily's] mood and stabilizes that mood and tries to not have her act on some of those thoughts that she may be having and verbalizing to staff" and that "[t]here really, in the doctor's testimony, aren't alternatives" to medication and that "[s]he needs medication." It also determined Emily was incapable "of expressing an understanding of the advantages and disadvantages of the psychotropic medication [so] as to make an informed decision as to whether to take" it.

¶14 The circuit court also noted Mr. Herman's testimony about Emily's verbal abusiveness, contrasting it somewhat with Dr. Musunuru's, before returning to Dr. Musunuru's testimony:

> Although the social worker did testify that he feels that her verbally abusive statements-- And, frankly, when somebody says verbally abusive, I think there's a wide spectrum of what can be categorized as verbally abusive. I don't necessarily think that that rises to the level of threats of harm to self or others.
>
> It can be loud. It can be boisterous, maybe profane at times, you know, those laundry list definitions that we use for disorderly conduct. But as [Emily's counsel] has referenced, I think that can be fairly vague. And I think the social worker here didn't provide us much beyond saying verbally abusive. And to me that doesn't mean much, to be honest, in this case here. *But the doctor did testify as to I think what some of those specifics were. When she's threatening harm to kill others, that's pretty direct, pretty threatening, and pretty consistent with the statutory factors associated with a Chapter 51 proceeding when we talk about danger to self or others.* In this case I don't know that there's a lot of threat to harm to self *but certainly those threats to others that the doctor had testified regarding.*

(Emphases added.) Accordingly, the court found, specifically noting the clear and convincing evidence standard, that Emily "has a chronic and persistent mental illness[] that … is permanent or likely to be permanent," that there was "potential substantial harm to others" regarding the threats she had made, "and that if she

was not protectively placed, [Emily] would present a substantial risk of harm to others." Emily appeals.

## II. STANDARD OF REVIEW

¶15 The clear and convincing evidence standard applies to an order granting a ch. 55 petition for the involuntary administration of psychotropic medication. *See* WIS. STAT. § 55.14(8). Whether the County met its burden of proof presents a mixed question of law and fact. *See **Waukesha County v. J.W.J.**,* 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. This court "will uphold a circuit court's findings of fact unless they are clearly erroneous[,]" ***Langlade County v. D.J.W.***, 2020 WI 41, ¶24, 391 Wis. 2d 231, 942 N.W.2d 277, and this court "'accept[s] reasonable inferences from the facts available to the circuit court[,]'" ***Winnebago County v. Christopher S.***, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (quoted source omitted). "A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." ***D.J.W.***, 391 Wis. 2d 231, ¶24. However, "whether the facts satisfy the statutory standard" is a question of law this court reviews independently. ***Id.***, ¶¶25, 47; *see also* ***Outagamie County v. Melanie L.***, 2013 WI 67, ¶39, 349 Wis. 2d 148, 833 N.W.2d 607.

## III. DISCUSSION

¶16 Emily does not challenge the circuit court's protective placement order; thus, the sole issue presented on appeal is whether clear and convincing evidence in the Record supports the court's factual findings upon which it concluded Emily is a proper subject for the involuntary administration of psychotropic medication.

10

¶17 On appeal, Emily contends the County failed to establish she "will incur a substantial probability of physical harm, impairment, injury, or debilitation or will present a substantial probability of physical harm to others" under either WIS. STAT. § 55.14(3)(e)1 or 55.14(3)(e)2. *See* § 55.14(3)(e)1-2. First, she says, the County did not introduce any evidence establishing she had a "history of at least 2 episodes, one of which has occurred within the previous 24 months, that indicate a pattern" of dangerous activity resulting from her "failure to participate in treatment[,]" *see* § 55.14(3)(e)1, and that "even if it could possibly be argued that any of the evidence presented at" the hearing "satisfied the 'pattern' of dangerous behavior requirement, the record is devoid of any evidence that any such episode resulted in a finding of probable cause to commit [her] under WIS. STAT. § 51.20."

¶18 Second, she says the County likewise failed to establish dangerousness under WIS. STAT. § 51.20(1)(a)2.a-e. *See* WIS. STAT. § 55.14(3)(e)2. According to Emily, "the record is not at all clear which specific standard of dangerousness the county sought to prove or upon which standard the circuit court's order is based" and that Dr. Musunuru's testimony that she "can be aggressive, violent" and that she has made "threats" was "vague" given that he did not testify about any "specific impact that not taking psychotropic medication has had on [her]." Thus, she says, while the "circuit court's order for involuntary medication may[,]" "[i]n theory," "be based on a conclusion that … [she] is dangerous under either the first or second standard of dangerousness" set forth in § 51.20(1)(a)2.a-b, "the county presented no evidence that [she] is a danger to herself" under the first standard. As for the second standard, § 51.20(1)(a)2.b, Emily asserts "[t]he only evidence that even arguably satisfies [that] standard is evidence that [she] sometimes 'talks' about hurting or killing others and is

11

verbally abusive around staff at the facility where she is protectively placed." She argues such evidence is insufficient because the referenced "threats" are "vague, generic, and unspecified" whereas § 51.20(1)(a)2.b "requires evidence of a 'substantial probability of physical harm to others,' not simply harsh or 'verbally abusive' language by an individual [who] is extremely frustrated to be protectively placed."

¶19    In response, the County argues "[t]he circuit court found that Emily's behavior met the criteria set forth under WIS. STAT. § 51.20(1)(a)2.b[,]" which it suggests is clear from the court's reference to Dr. Musunuru's "testimony that Emily talked about killing other people" and the court's conclusion that Emily's "threatening harm to kill others[ is] pretty direct, pretty threatening, and pretty consistent with the statutory factors associated with a Chapter 51 proceeding[] when we talk about danger to self or others." Citing *Melanie L*, 349 Wis. 2d 148, ¶97, the County posits that even though the court "did not recite" § 51.20(1)(a)2.b's statutory language, it is clear the court's factual findings are "sufficiently linked back to the" statutory language such that "the parties and any reviewing courts [can] understand exactly what facts were found and their relationship to the court's ultimate order."

¶20    The County further contends it presented ample evidence at the due process hearing to support the circuit court's findings. For example, it points to Dr. Musunuru's testimony that Emily has frequent mood changes and that "during those times, she can be aggressive, violent[,]" that Emily "need[s] to be watched very careful[ly] because she gets -- frequently talks about hurting herself or hurting others[,]" and that Emily has talked about "killing a lot of people when [he] was evaluating her." This was also sufficient, it says, to establish Dr. Musunuru was placed in reasonable fear of safety for others. *See* WIS. STAT.

§ 51.20(1)(a)2.b; ***Marathon County v. D.K.***, 2020 WI 8, ¶42, 390 Wis. 2d 50, 937 N.W.2d 901. Additionally, the County also identifies Dr. Musunuru's Guardianship Report and Involuntary Medication Report as supporting the court's findings, as those reports include notations that Emily made threats about killing her husband, psychiatrist, and others.[6] In its appellate brief, the County does not argue that sufficient evidence in the Record supports a finding of dangerousness under § 51.20(1)(a)2.a as an alternate means of satisfying WIS. STAT. § 55.14(3)(e).

¶21 WISCONSIN STAT. § 55.14 governs the Involuntary Medication Order at issue in this matter. As relevant here, § 55.14(3) identifies certain information that must be alleged in a petition seeking a ch. 55 involuntary medication order, and § 55.14(8) provides that such allegations must be established by clear and convincing evidence before a circuit court may enter an involuntary medication order. On appeal, Emily argues only that the County failed to establish by clear and convincing evidence that she "will incur a substantial probability of physical harm, impairment, injury, or debilitation or will present a substantial probability of physical harm to others" under § 55.14(3)(e), thus rendering the Involuntary Medication Order invalid. It is therefore unnecessary to address § 55.14(3)'s other requirements.

---

[6] The County also points to the Annual Protective Placement Review the circuit court precluded it from entering into evidence at the hearing. Because this court is satisfied the evidence presented at the hearing, particularly Dr. Musunuru's testimony and his corresponding reports, sufficiently supports the circuit court's findings, it is unnecessary to rely on the Annual Protective Placement Review. It is therefore also unnecessary to address the parties' respective arguments as to whether or not this court can do so in the first instance.

¶22     WISCONSIN STAT. § 55.14(3)(e) requires that a petition for involuntary psychotropic medication allege that:

> (e) Unless psychotropic medication is administered involuntarily, the individual will incur a substantial probability of physical harm, impairment, injury, or debilitation or will present a substantial probability of physical harm to others.  The substantial probability of physical harm, impairment, injury, or debilitation shall be evidenced by one of the following:
>
> 1. The individual's history of at least 2 episodes, one of which has occurred within the previous 24 months, that indicate a pattern of overt activity, attempts, threats to act, or omissions that resulted from the individual's failure to participate in treatment, including psychotropic medication, and that resulted in a finding of probable cause for commitment under s. 51.20(7), a settlement agreement approved by a court under s. 51.20(8)(bg), or commitment ordered under s. 51.20(13).
>
> 2. Evidence that the individual meets one of the dangerousness criteria set forth in s. 51.20(1)(a)2.a. to e.

Sec. 55.14(3)(e)1-2.  Establishing such "substantial probability of physical harm, impairment, injury, or debilitation or … substantial probability of physical harm to others[,]" *see* § 55.14(3)(e), requires that the petitioning party provide clear and convincing evidence, *see* § 55.14(8).  In its appellate brief, the County fails to respond to Emily's contention that there is no clear and convincing evidence in the Record upon which the circuit court could have concluded § 55.14(3)(e)1 applies; accordingly, the County is deemed to have conceded she is correct and this court will not address whether that subdivision applies.  *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (holding that a party's failure to refute an argument constitutes a concession); *United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578.  This court's review is therefore limited to determining whether the County submitted clear and convincing evidence that

supports the court's finding that Emily "meets one of the dangerousness criteria set forth in s. 51.20(a)2.a. to e." *See* § 55.14(3)(e)2.

¶23 At the outset, this court notes the circuit court did not specifically cite WIS. STAT. § 51.20(1)(a)2.a-e during the course of the hearing, and the Involuntary Medication Order likewise does not specifically identify or recite that statute. However, this court has reviewed the Record and it is clear from the hearing transcript that the circuit court determined the County carried its burden of establishing dangerousness under § 51.20(1)(a)2.b, which pertains to threat of harm to others.[7] *See* § 51.20(1)(a)2.b ("substantial probability of physical harm to other individuals" may be established "by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent … threat to do serious physical harm"). Specifically, the court referenced Dr. Musunuru's testimony "that [Emily] does or has made threats of harm *to others*" and the multiple "reference[s] in his report … about her talking about killing *other people*[,]" which led it to believe "there is that type of dangerousness with regards to those threats of harm." (Emphases added.) Emily acknowledges as much—stating that Dr. Musunuru's confirmation that the report he submitted to the court "denoted the a and b standards as far as 51.20 dangerousness"—despite also arguing "the record is not at all clear which specific

---

[7] Although it is clear from the transcript as a whole that the circuit court relied on WIS. STAT. § 51.20(1)(a)2.b for the purpose of WIS. STAT. § 55.14(3)(e)2, the parties and court are reminded of the importance of specifically referencing and identifying the statute relied upon in order to assist appellate courts on review. *See **Langlade County v. D.J.W.***, 2020 WI 41, ¶3, 391 Wis. 2d 231, 942 N.W.2d 277 ("circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2 on which the recommitment is based").

standard of dangerousness the county sought to prove or upon which standard the circuit court's order is based."

¶24 Turning to the issue here, WIS. STAT. § 55.14(3)(e)2 incorporates by reference WIS. STAT. § 51.20(1)(a)2.b, which provides the following avenues by which a party may establish dangerousness: (1) by submitting evidence there is "a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior"; or (2) through "evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm." Sec. 51.20(1)(a)2.b. Having reviewed the Record, this court is satisfied the County presented clear and convincing evidence sufficient to support the circuit court's conclusion that Emily is dangerous within the meaning of § 51.20(1)(a)2.b for the purpose of satisfying § 55.14(3)(e)2.

¶25 At the due process hearing, Dr. Musunuru testified that not only does Emily "get[] delusional thinking" and have "thoughts of hurting people, killing people[,]" but also that she "talk[ed] about killing a lot of people" *during* the evaluation itself. Dr. Musunuru also indicated in one of the reports entered into evidence that Emily had made "verbal threats of killing [her husband]" and also "talk[ed] about killing [a] few people[,]" including "her husband, and her psychiatrist." Although it is not clear whether she ever made these threats directly to her husband or the referenced psychiatrist, for the purpose of satisfying WIS. STAT. § 51.20(1)(a)2.b, it is sufficient that "others are placed in a fearsome position by a disturbed person's actions even if the person placed in that position has no subjective awareness of it." *See R.J. v. Winnebago County*, 146 Wis. 2d 516, 522-23, 431 N.W.2d 708 (Ct. App. 1988). It is certainly reasonable to infer from Dr. Musunuru's testimony and reports that he had valid concerns for others'

safety. Taken as a whole, threatening to kill people, particularly where certain individuals have been identified, certainly qualifies as a threat to do harm to others, and it is clear the circuit court relied upon Dr. Musunuru's testimony regarding these statements in concluding Emily is dangerous under § 51.20(1)(a)2.b. Having established dangerousness under § 51.20(1)(a)2.b, the County therefore also satisfied the requisites of WIS. STAT. § 55.14(3)(e)2 for the purpose of the Involuntary Medication Order.

¶26 Based on the totality of the evidence provided at the hearing, and particularly Dr. Musunuru's testimony and his corresponding reports, this court is satisfied that the circuit court's findings, which it clearly tied to the testimony presented at the hearing, were not clearly erroneous. Accordingly, it did not err in concluding Emily is dangerous within the meaning of WIS. STAT. § 51.20(1)(a)2.b for the purpose of establishing Emily "will incur a substantial probability of physical harm, impairment, injury, or debilitation or will present a substantial probability of physical harm to others." *See* WIS. STAT. § 55.14(3)(e)2. The State met its burden.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.